

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-24-00151-CR

———————————————————

DAVID ALLEN PIXLEY, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 213th District Court
Tarrant County, Texas
Trial Court No. 1813948

---

Before Kerr, Birdwell, and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I. INTRODUCTION

Appellant David Allen Pixley appeals his convictions for continuous sexual abuse of a child under fourteen and indecency with a child by contact. *See* Tex. Penal Code Ann. §§ 21.02(b), 21.11(d). The jury assessed punishment at confinement in the Institutional Division of the Texas Department of Criminal Justice (TDCJ) for a term of fifty years for the first conviction and a term of fifteen years for the second conviction. The trial court sentenced Pixley accordingly, ordering that the sentences were to run concurrently. In four issues on appeal, Pixley argues that (1) the trial court abused its discretion by denying his request for a continuance, (2) the admission of M.P.'s (Mary's) extraneous-offense testimony amounted to reversible harm, (3) the trial court abused its discretion in allowing extraneous-offense testimony over a Rule 403 objection, and (4) the evidence was insufficient to support the conviction for continuous sexual abuse against A.L. (Alice).[1]

### II. BACKGROUND

#### A. Alice's Relationship with Pixley

Alice's mother (Mother) is Pixley's cousin. Mother and Alice's father (Father) got married in 2010 and then separated in 2012. In 2019, Alice and her sister were

---

[1]We use aliases to refer to the children in order to protect their privacy. *See* Tex. R. App. P. 9.10(a)(3) (providing privacy protection for sensitive data in criminal cases, including the name of any person who was a minor at the time of the offense).

living with Father and visited Mother during spring break, summer, and Thanksgiving break.

During that summer, Mother, Alice, and her siblings spent some time at Pixley's home. Pixley played with the children, and Mother believed they were comfortable with him. Alice and her sister stayed overnight at Pixley's house on August 3, 2019, and the next day, the girls returned to Father's house. Alice did not visit Pixley's house again until Thanksgiving 2019—Mother was living with Pixley at that time, so Alice and her siblings stayed at Pixley's house as well. Mother moved out of Pixley's home shortly thereafter.

## B. Pixley's Abuse of Alice

Alice and her sister spent the night at Pixley's house—without Mother—on August 3, 2019. It was their first sleepover at Pixley's house, and Alice was eight years old at the time.

At Pixley's trial in April 2024, Alice, then thirteen years old, testified that the August sleepover was the first time that Pixley sexually abused her. According to Alice, when she stayed at Pixley's home, she slept on the couch or the floor in the living room. Mother also testified that everyone slept in the living room, either on the couch or a chair, with the children sleeping on a pallet on the floor, as it was a "fairly large living room."

Alice testified that the time she stayed overnight with just her sister, the plan was for everyone—Alice, her sister, Pixley, and Pixley's wife—to sleep in the living room

3

that night. Alice's testimony details the progressive acts by Pixley that night. First, Pixley laid behind Alice on the couch and hugged her, and he then began touching her chest, moving down to her "private area" between her legs. Pixley then took off both his and Alice's clothing and, holding Alice's hand, walked her from the living room to the bedroom. Pixley forced Alice to watch him urinate in the bathroom and then positioned her on the bed. While they were on the bed, Pixley put his mouth on Alice's "private areas," had Alice put her mouth on his "private areas," and then "put his private areas in [hers]."[2] Alice testified that she felt "uncomfortable" five times during her testimony, that she was in pain during these acts, and that she "wish[ed] [she] would have" yelled for Pixley's wife. Pixley then told Alice not to "tell anyone" and that "no one would believe [her] anyways."

Alice recalled another time that Pixley did "[e]verything from the first night" when Mother was also staying at the house. She also testified that Pixley did these things "[m]ore than two times."

Alice could not recall the exact dates she visited Mother or stayed at Pixley's house, but Mother testified that the only time Alice and her sister stayed overnight alone was August 3, 2019, and that the next time Alice visited and stayed at Pixley's house

---

[2]Alice testified that Pixley's "private area" is also called a penis and that her private area was her "lady area." (She did not use the word "vagina" but referred to "the hole down there" that was not her butt, or what she uses to pee.)

4

was during Thanksgiving 2019, when Mother was living there. Alice did not outcry this abuse until July 15, 2022.

## C. Mary's Extraneous-Offense Testimony

Mary, Alice's cousin, also testified at Pixley's trial. Mary was listed on the "State's Potential Witness & Expert Witness List" and was the basis for the "State's Notice of Intent to Introduce Evidence of Extraneous Offenses, Other Crimes, Wrongs and Bad Acts Pursuant to Article 37.07, 38.37, & 38.371 C.C.P. & Rule 404(b) T.R.E. and Impeachment Under Rule 609 T.R.E." Both documents were filed on December 19, 2023. The notice of extraneous offense included the allegation that "on or about the 19th day of September 2019, the Defendant touched [Mary] in an inappropriate manner." The notice further stated that, according to Mary, Pixley "was being creepy towards her," that he "kept sitting close to her and touching her," and that Pixley "groped her above her clothes." The notice also stated that "[w]itnesses observed [Pixley] following [Mary] around the house that night."

The day that testimony began for Pixley's trial, Mary disclosed additional information to the State that "amount[ed] to an outcry of sexual abuse."[3] The State revealed this disclosure to the trial court and to the defense before opening statements were made. The State argued that the additional information amounted to "indecency

---

[3]Mary admitted during her testimony that she had not informed anyone, other than her therapist, of these "other" events until she told the prosecutor before trial began.

5

by contact of a breast touch [under her clothing] and indecency by contact of the genitals" over her clothing. The State acknowledged that these allegations were not properly disclosed and stated that it did not intend to get into them in its case-in-chief, but that it would "potentially" use the information if appropriate on rebuttal.[4]

Immediately prior to Mary's testimony, the defense objected under Rules 401, 402, and 403 of the Texas Rules of Evidence and under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and corresponding provisions of the Texas Constitution. The trial court ruled that Mary was permitted to testify and limited that testimony to those allegations timely disclosed in the December notice of intent to introduce extraneous-offense evidence.

In the State's case-in-chief, Mary testified that when she was ten or eleven years old, she and her siblings stayed overnight at Pixley's house during summertime in 2019. Mary stated that Pixley "kept trying to tickle [her] and keep [her] close to him." Pixley tickled her on her stomach and legs and told her how much he loved her and "was always there for [her]." When Mary tried to pull or move away from Pixley, he would either not let her, or he would follow her. All of these actions made Mary feel uncomfortable. Mary testified that Pixley was very focused on her that night and that his behaviors increased when her siblings were not looking. Mary also felt like Pixley

---

[4]The "new" statements from Mary were offered on rebuttal and were subject to cross-examination by Pixley's counsel.

attempted to get her alone in another room, only asking her and not her siblings to go with him.

According to Mary, Pixley did get Mary alone that evening by having her accompany him to the store. In the car, Pixley "went on a very, very emotional rant . . . about how much he love[d] [her]" and invited her to stay at his house, even if her parents "weren't okay with it." Pixley continued to touch Mary on her hands and thigh in the car. After this night, Mary told her mother she did not want to visit Pixley again. Later, "about the same time as [Alice's]" forensic interview, Mary also participated in a forensic interview regarding her experience with Pixley.

## D. Pixley's Testimony

Pixley testified at trial during the defense's case-in-chief. Pixley's testimony confirmed that Mother lived with him for approximately three months, beginning in October 2019. Pixley testified that on August 3, 2019, he was involved in monthly drill duties for the National Guard and returned home around 6:00 p.m. He claimed that he was suffering from undiagnosed anemia at the time and that he "wasn't even able to walk ten feet without being completely winded, out of breath." Pixley denied the allegations made by Alice, and when asked why she would say what she did, he responded that he "couldn't even fathom why." Pixley could not recall if Alice and her sister stayed at his home on August 3, 2019.

During cross-examination by the State, Pixley admitted that he did "try to get [Mary] in a better mood . . . by tickling" her. Additionally, Pixley acknowledged that he

7

told the detectives that he followed Mary from the couch to the chair and that he attempted to tickle her ribs and show comfort by touching her knee and letting her know that "she was very loved by the whole family."[5] Pixley denied touching Mary anywhere else. Pixley also affirmed that Mary did not come over again after he touched her.

### E. Request for Continuance

The defense did not request a continuance when it first discovered Mary had made additional outcry statements before the guilt-innocence phase of trial. Prior to Mary's testimony, the State claimed it only intended to offer the evidence as to which the defense had been properly noticed. The defense objected to all of Mary's testimony, and the trial court considered the objections and arguments overnight.

The next morning, the defense made an oral motion for a continuance, asking the trial court to allow for "the opportunity to investigate what statements [Mary] made to her therapist over a five-year period, when she made those statements." The defense sought the opportunity to discover "potential impeachment information and to learn what other statements [Mary] may have made." Because at that time the State was only intending to offer the evidence that had been properly noticed, the trial court stated that it would "work informally on this other issue about the records" and that it would

_____

[5]Pixley testified that this was because Mary's parents were going through a divorce. [5RR188:23-189:17]

8

come back to the issue "in a little bit." The trial court ultimately overruled the objections to Mary's testimony. Mary testified about the events that she initially disclosed, and then the State rested.

Pixley testified next, and following his testimony, but before he was cross-examined, the State argued that Mary's additional outcry statements were admissible to rebut a defensive theory that Alice lied. Ultimately, the trial court allowed Mary's additional testimony. The defense again objected under Rules 401 and 403 of the Texas Rules of Evidence; the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; and corresponding provisions of the Texas Constitution. The defense also claimed a lack of notice under Article 38.37 of the Code of Criminal Procedure. All of the objections were overruled.

Pixley also re-urged his oral motion for continuance before Mary's rebuttal testimony, arguing that he needed access to Mary's therapy records. The trial court, although it signed an order giving Pixley access to these records, [CR161] denied the motion.

## F. Rebuttal Extraneous-Offense Testimony

After the defense rested its case-in-chief, Mary was called as a rebuttal witness to detail the incident with Pixley that she disclosed the day trial began. Mary testified that in addition to tickling her, the touching escalated to Pixley putting his hands underneath her shirt and touching her chest, as well as touching her over her clothes between her

9

legs.[6] She stated that she felt like he intentionally touched her "[b]ecause he didn't pull away." Mary testified that this happened "[m]ultiple" times that night. She attempted to pull away but could not.

Pixley's attorney cross-examined Mary about her denial during the forensic interview that Pixley had touched her breasts or genitals. Mary agreed this was true but she then testified that she had told her therapist about the events in 2022. Mary testified that she waited so long to say something about these events because she "was scared . . . [and] thought [she] was being dramatic." She stated, "I didn't know any better."

Immediately after Mary's testimony, the trial court instructed the jury not to consider this testimony from Mary, "unless you find beyond a reasonable doubt that the defendant did, in fact, commit the wrongful act" and that "[e]ven if you do find that the defendant committed a wrongful act, you may consider this evidence only for the limited purposes . . . described." The trial court informed the jury that the State "offered the evidence to show absence of mistake or lack of accident and to rebut a defensive theory of fabrication." The trial court then further instructed the jury that it

---

[6]Mary stated she "[did not] know what word to use for it," but when pressed by the State, she stated it was her private area that was used "[t]o pee."

was not permitted to consider the evidence "to prove that the defendant is a bad person and for this reason was likely to commit the charged offense."[7]

Pixley testified again after Mary's rebuttal testimony, denying the accusations. Both sides rested and closed. The jury returned a verdict of guilty under Count One and Count Five of the indictment. The trial court accepted the verdict, both sides presented evidence on punishment, and the jury reached a verdict as to punishment. The trial court sentenced Pixley according to the jury's verdict, and this appeal followed.

## III. DISCUSSION

### A. Motion for Continuance

In his first issue, Pixley argues that the trial court erred by denying his oral motion for continuance to acquire Mary's therapy records. However, because this issue was not properly preserved, Pixley has forfeited this complaint on appeal, and even if Pixley had not forfeited this complaint, the trial court did not abuse its discretion.

#### 1. Standard of Review and Applicable Law

A request for a continuance during trial is governed by Article 29.13 of the Texas Code of Criminal Procedure, which provides that

> [a] continuance or postponement may be granted on the motion of the State or the defendant after the trial has begun, when it is made to appear to the satisfaction of the court that by some unexpected occurrence since the trial began, which no reasonable diligence

---

[7]The jury charge also included this limiting instruction.

11

could have anticipated, the applicant is so taken by surprise that a fair trial cannot be had.

Tex. Code Crim. Proc. Ann. art. 29.13. "The granting or denying of a motion for continuance is within the sound discretion of the trial court." *Renteria v. State*, 206 S.W.3d 689, 699 (Tex. Crim. App. 2006) (citing *Heiselbetz v. State*, 906 S.W.2d 500, 511–12 (Tex. Crim. App. 1995)). To show the trial court abused its discretion, the appellant must demonstrate (1) that the trial court erred, and (2) that his defense was actually and specifically prejudiced. *Rivera v. State*, 708 S.W.3d 732, 737 (Tex. App.—San Antonio 2024, pet. ref'd) (quoting *Kinnett v. State*, 623 S.W.3d 876, 906 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (internal quotations omitted)). A "bare assertion" that trial counsel did not have adequate time to prepare is not enough to establish prejudice. *Id.* at 738. Instead, a defendant must show "with specificity that the trial court's ruling resulted in actual prejudice to his defense." *Milem v. State*, No. 02-24-00201-CR, 2025 WL 1536399, at *2–3 (Tex. App.—Fort Worth May 29, 2025, pet. ref'd) (mem. op., not designated for publication) (citing *Janecka v. State*, 937 S.W.2d 456, 468 (Tex. Crim. App. 1996)).

To preserve for review a claim that the trial court erred in denying a motion for continuance, the defendant must timely file a sworn, written motion that sufficiently advises the trial court of the defendant's request and the grounds for it. *Blackshear v. State*, 385 S.W.3d 589, 591 (Tex. Crim. App. 2012); *Anderson v. State*, 301 S.W.3d 276, 279 (Tex. Crim. App. 2009); *see also* Tex. Code Crim. Proc. Ann. arts. 29.03, 29.08.

12

Article 29.13 "does not address or remove the requirement that a motion for continuance must be in writing." *Gober v. State*, No. 02-17-00032-CR, 2018 WL 772068, at *4 (Tex. App.—Fort Worth Feb. 8, 2018, pet. ref'd) (mem. op., not designated for publication) (citing Tex. Code Crim. Proc. Ann. art. 29.13). Both this court and the Court of Criminal Appeals have applied the in-writing requirement to motions for continuance filed during trial. *Id.* (first citing *Matamoros v. State*, 907 S.W.2d 470, 478 (Tex. Crim. App. 1995), then citing *Woodall v. State*, 77 S.W.3d 388, 401 (Tex. App.—Fort Worth 2002, pet. ref'd)). In other words, the trial court's denial of an unsworn oral motion for continuance preserves nothing for appellate review. *See Blackshear*, 385 S.W.3d at 591; *Venancio v. State*, No. 02-21-00147-CR, 2022 WL 17687436, at *5 (Tex. App.—Fort Worth Dec. 15, 2022, no pet.) (mem. op., not designated for publication); *Robinson v. State*, 310 S.W.3d 574, 578–79 (Tex. App.—Fort Worth 2010, no pet.).

### 2. Pixley's Complaint

Pixley argues on appeal that his request was merely for a "postponement" of trial rather than for a continuance.[8] He argues that an "oral motion for a 'postponement' of

---

[8]In his appellate brief, Pixley specifies that he "recognizes that the failure by his lawyers to file a written sworn motion for continuance of the trial under [Texas Code of Criminal Procedure] [A]rticle 29.03 would result in the waiver of a complaint on appeal that the trial court's denial of a continuance was an abuse of discretion." Because of that, his complaint on appeal "is premised upon his request under . . . [A]rticle 29.13 for a *postponement* after trial has started."

13

trial which was not reduced to writing and was unsworn may be addressed on appeal on equitable grounds." In support of this argument, Pixley points to *Walker v. State*, No. 2-05-327-CR, 2007 WL 79580, at *4 (Tex. App.—Fort Worth Jan. 11, 2007, pet. dism'd, untimely filed) (mem. op., not designated for publication). Pixley contends that the Code of Criminal Procedure does not reference the need for a written, sworn motion when asking for a postponement.

### 3. Analysis

First, we agree with Pixley that the record reflects that his motion for continuance was oral, not written, and thus any complaint is not preserved for our review on appeal. *See Blackshear*, 385 S.W.3d at 591.

However, we would reach the same conclusion even if, as Pixley claims, a request for a postponement does not need to be written or sworn. Pixley ignores that in *Walker*, we noted that we have previously "expressly declined" to hold that an oral motion for postponement of trial—not reduced to writing and unsworn—may be addressed on equitable grounds. *Walker*, 2007 WL 79580, at *4 (holding that it was unnecessary to revisit this previous holding because the appellant failed to show due diligence as required for a continuance because of a missing witness).

---

And we note that—despite this distinction on appeal—each time Pixley made this request at trial, he specifically requested a "continuance": (1) "[a]t this time we would seek to stay this proceeding and seek a continuance," (2) "we would ask for a continuance of this cause," and (3) "[w]e would additionally reurge our motion for continuance and to stay proceedings."

Just as in *Walker*, we need not revisit our prior holding. Despite Pixley's claims, he fails to show how this testimony could not have been anticipated by reasonable diligence or how he was so "taken by surprise that a fair trial" could not be had. *Fears v. State*, 479 S.W.3d 315, 325 (Tex. App.—Corpus Christi–Edinburg 2015, pet. ref'd) (citing Tex. Code Crim. Proc. Ann. art. 29.13). Merely citing the reason for the request—here to obtain Mary's therapy records—without any attempt to show why a fair trial could not be had without them, does not support a postponement or a continuance. *See id.*; *see also Barney v. State*, 698 S.W.2d 114, 127 (Tex. Crim. App. 1985) (en banc) (holding under Article 29.13, "it must appear to the satisfaction of the court that a fair trial cannot be had before a continuance or postponement is warranted" (internal quotations omitted)).

Further, Pixley's only complaint on appeal is that the failure to obtain Mary's therapy records "resulted in [him] being denied the opportunity to confront and cross-examine witnesses against him." We disagree. Pixley's attorney was able to cross-examine Mary, pointing out to the jury that she had previously told the forensic interviewer that she had not been abused by Pixley or by "anybody." Pixley's counsel also pointed out during cross-examination that, although Mary had claimed she "told [her] therapist about the breast touches and genital touches back in 2022," her therapist "never made a report," despite having "a mandatory duty to report sex offenses against children." Thus, the record does not support Pixley's complaint that he was denied the opportunity to confront and cross-examine witnesses against him, and his complaint is

15

only an example of theoretical harm. *Cf. Renteria*, 206 S.W.3d at 702 (holding that a claim of inadequate time to investigate still requires more than speculation of harm to justify reversal for the trial court's failure to grant a continuance); *Venancio*, 2022 WL 17687436, at *5 (holding that when the State does not include a name on its potential witness list—but included that witness in a motion in limine disclosing prior criminal convictions—the defense has sufficient notice that the State is not relying on that witness and if the defense would like to speak with the witness he is responsible for securing that testimony); *Washington v. State*, No. 12-18-00360-CR, 2020 WL 1528065, at *4 (Tex. App.—Tyler Mar. 31, 2020, pet. ref'd) (mem. op., not designated for publication) (stating that where the defendant failed to identify additional witnesses he would have called or what additional questions he would have asked if the continuance was granted did not establish prejudice or demonstrate reversible error).

After considering the record and Pixley's arguments in light of the trial court's considerable discretion, as well as Pixley's obligation to show specific harm, we hold that he has not demonstrated an abuse of discretion. *See Heiselbetz*, 906 S.W.2d at 512 ("Absent a showing of prejudice, we cannot hold the trial court abused its discretion in overruling appellant's motion for continuance."). We overrule Pixley's first issue.

## B. Admission of Evidence

In Pixley's second and third issues, he contends that the trial court erred in admitting Mary's testimony about his alleged indecent conduct against her. Because both issues concern the admission of evidence, we address these issues together.

16

In his second issue, Pixley argues that this admission of Mary's rebuttal testimony amounts to a constitutional violation and should be reviewed for harm under Rule 44.2(a)[9] of the Texas Rules of Appellate Procedure. Pixley claims that the trial court erred in admitting Mary's extraneous-offense testimony because it violated his constitutional rights under "the [F]ourteenth [A]mendment's due process clause to the admissibility of the newly discovered extraneous conduct evidence."[10] Pixley concedes

---

[9]Pixley's appellate brief cites to Rule 42.2(a) of the Texas Rules of Appellate Procedure, but as this rule is about voluntary dismissal in criminal cases and not about reversible error, we presume the brief intended to cite to Rule 44.2(a). *See* Tex. R. App. P. 42.2(a), 44.2(a).

[10]Pixley also claims the admission of this evidence was a violation of his rights guaranteed under the Sixth Amendment. Despite this assertion, Pixley provides no analysis or additional legal support for this claim. This failure amounts to briefing waiver of these alleged constitutional violations. *See* Tex. R. App. P. 38.1(i). However, if we were to construe Pixley's statement that the evidence should have been "excluded on constitutional due process grounds including those rights guaranteed by the [S]ixth [A]mendment" to be a claim that his Sixth Amendment right to confrontation was violated, we still would not find error in the admission of Mary's rebuttal testimony.

The Sixth Amendment's Confrontation Clause reflects a strong preference for face-to-face confrontation at trial, and an encroachment on that right is permitted only when necessary to further an important public interest and when the reliability of the testimony is otherwise assured. *Romero v. State*, 173 S.W.3d 502, 505 (Tex. Crim. App. 2005). The Sixth Amendment right to confront witnesses includes the right to cross-examine witnesses to attack their general credibility or to show their possible bias, self-interest, or motives in testifying. *Johnson v. State*, 490 S.W.3d 895, 897 & n.1 (Tex. Crim. App. 2016) (remanding for Rule 44.2(a) harm analysis on exclusion of evidence of victim's past sexual behavior). A defendant's Sixth Amendment right to confront witnesses may be violated by disallowing a certain line of questioning during cross-examination of the State's principal witness against the defendant. *See Jones v. State*, 571 S.W.3d 764, 765 (Tex. Crim. App. 2019).

that "the State appropriately disclosed the extraneous-offense evidence promptly after it learned about it from [Mary]" and appears to challenge only that the lack of a continuance deprived him of the time needed to investigate and confront the evidence. Pixley alleges that this admission caused reversible harm.

In his third issue, Pixley claims that the trial court erred in overruling his Rule 403 objection to Mary's rebuttal testimony. Pixley objected to this testimony under Rule 403, claiming the prejudice far outweighed the probative value because it was likely to result in unfair prejudice and confuse the issues to the jury. On appeal, Pixley argues only that the admission of Mary's testimony resulted in unfair prejudice.

### 1. Standard of Review

We review the trial court's decision to admit evidence for an abuse of discretion. *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018). Because the trial court "has the best view of the evidence," an appellate court will not find error in a trial court's ruling if it falls within the zone in which reasonable minds may differ. *Inthalangsy v. State*,

---

As we have noted, Pixley was able to cross-examine Mary during her rebuttal testimony, pointing out that she actively denied any indecent conduct during her forensic interview. Mary agreed that she had denied any indecent acts during the interview. Pixley was further able to cast doubt on Mary's assertion that she told her therapist about the abuse by pointing out that her therapist would have been obligated to report such abuse but had not done so. Pixley also highlighted Mary's relationship with Alice—exposing a possible bias she may have had in testifying. Pixley successfully attacked Mary's general credibility and showcased a possible motive or bias in her choosing to testify. *See Hammer v. State*, 296 S.W.3d 555, 561 (Tex. Crim. App. 2009). We thus would not find constitutional error on the Sixth Amendment ground if it had been alleged.

18

634 S.W.3d 749, 754 (Tex. Crim. App. 2021); *Jumper v. State*, No. 02-22-00286-CR, 2024 WL 3059060, at *2 (Tex. App.—Fort Worth June 20, 2024, pet. ref'd) (mem. op., not designated for publication). However, if the trial court's decision falls outside the "zone of reasonable disagreement," it has abused its discretion. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g).

### 2. Applicable Law

Under Rule 403, a trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. "Unfair prejudice refers to the evidence's tendency to tempt the jury into finding guilt on grounds apart from proof of the offense charged." *Perkins v. State*, 664 S.W.3d 209, 216 (Tex. Crim. App. 2022) (internal citations omitted).

Following a Rule 403 objection, the trial court has a nondiscretionary obligation to weigh the probative value of the evidence against the unfair prejudice of its admission. *Sanders v. State*, 255 S.W.3d 754, 760 (Tex. App.—Fort Worth 2008, pet. ref'd) (citing *Montgomery*, 810 S.W.2d at 389). When the trial court overrules a Rule 403 objection, we presume the trial court applied a Rule 403 balancing test and determined the evidence was admissible. *Id.*

The balancing test for a Rule 403 objection considers (1) the inherent probative force of the proffered item of evidence and (2) the proponent's need for that evidence

against (3) any tendency of the evidence to suggest a decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency that a jury that has not been equipped to evaluate the probative force of the evidence would give it undue weight, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

If the trial court abused its discretion in admitting the complained of evidence, that error is reviewed as nonconstitutional error. *Patterson v. State*, 508 S.W.3d 432, 440 (Tex. App.—Fort Worth 2015, no pet.) ("The erroneous admission of evidence is nonconstitutional error.") (citing *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010)). Nonconstitutional error will be reversed "only if it affects an appellant's substantial rights." *Id.*; Tex. R. App. P. 44.2(b) ("Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.").

An appellant's substantial rights are affected only if "the error had a substantial or injurious effect or influence on the jury's verdict." *Barshaw v. State*, 342 S.W.3d 91, 93–94 (Tex. Crim. App. 2011). "[W]e look to the entire record to determine whether the erroneously admitted evidence had anything more than a slight effect on the jury's verdict." *Traylor v. State*, 660 S.W.3d 214, 222 (Tex. App.—San Antonio 2022, no pet.). We consider all evidence admitted for the jury's consideration, the nature of the supporting evidence, the character of the alleged error, and the way the error may be considered with the other evidence in the case. *Patterson*, 508 S.W.3d at 440–41. "[A]n

20

appellate court must disregard the error if the court, 'after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect.'" *Bagheri v. State*, 119 S.W.3d 755, 763 (Tex. Crim. App. 2003) (quoting *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001)).

### 3. Rule 403 Analysis

Pixley claims that the admission of Mary's rebuttal testimony resulted in unfair prejudice. According to Pixley, "[w]ithout [Mary's] extraneous offense testimony in rebuttal, it was a 'he said-she said' case." Pixley argues that Mary's testimony was more prejudicial than probative because it is what "provided the [linchpin] tying the conduct alleged by [Alice] to similar conduct alleged by [Mary]."

Considering the first factor in the Rule 403 balancing test, the probative value of Mary's testimony—when offered to combat the defensive theory that Alice may have fabricated her allegations against Pixley—was significant. The State argued to the trial court that it was offering Mary's rebuttal testimony to combat the defensive theory that Alice may have lied. This was reflected in the limiting instruction given to the jury after Mary's rebuttal testimony. If the jury believed beyond a reasonable doubt that Pixley committed the acts against Mary, that could make more probable the fact that Alice was not lying in her testimony—a vital part of the State's case. *See Gigliobianco*, 210 S.W.3d at 641 (probative value refers to how strongly the evidence serves to make more or less probable the existence of a fact of consequence in the litigation, along with the proponent's need for the evidence); *see also Foster v. State*, No. 02-22-00109-CR,

21

2023 WL 4780566, at *4 (Tex. App.—Fort Worth July 27, 2023, no pet.) (mem. op., not designated for publication) (holding that when the only direct evidence is the complaining witness's testimony, the State has a strong need for evidence that supports that witness's credibility when it is called into question).

Under the second factor, Pixley's own statement—that without Mary's testimony the case was a "he said-she said" case—highlights the importance of Mary's testimony to the State's case. *See Robisheaux v. State*, 483 S.W.3d 205, 220 (Tex. App.—Austin 2016, pet. ref'd) ("Accordingly, the [need for the evidence] weighs strongly in favor of admission because without the evidence from L.E., the State's case would have basically come down to A.B.'s word against [the defendant's]." (internal quotations omitted)). Thus, considering the first and second *Gigliobianco* factors, we conclude both weigh in favor of admission.

The third factor also weighs in favor of admission. Pixley does not point to any evidence that Mary's testimony influenced the jury to make its decision on an improper basis. Mary's testimony was heavily called into question during cross-examination, and the offense she alleged was much less egregious than what Alice described. *See Norwood v. State*, No. 03-13-00230-CR, 2014 WL 4058820, at *5 (Tex. App.—Austin Aug. 15, 2014, pet. ref'd) (mem. op., not designated for publication) ("When the extraneous offense is no more heinous than the charged offense, evidence concerning the extraneous offense is unlikely to cause unfair prejudice.").

Considering the remaining three *Gigliobianco* factors, we conclude that Pixley has failed to show that Mary's extraneous-offense testimony was admitted in violation of Rule 403. As to the fourth factor, the trial court immediately gave a limiting instruction after Mary's rebuttal testimony, as well as in the jury charge, and there is no indication that the jury did not follow the trial court's instructions. *See Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996) (holding that the "impermissible inference of character conformity" that is always a danger with extraneous-offense evidence "can be minimized through a limiting instruction"); *see also Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005) (where the instruction is "clear, determinative, and it unambiguously limit[s] the consideration of the [extraneous-offense evidence,]" we presume the jury follows the trial court's instructions).

As to the fifth factor, Mary's testimony was not scientific or technical in nature, creating little risk that the jury would confuse the issues or give her testimony unfair weight. *See Miranda v. State*, No. 02-23-00324-CR, 2025 WL 1782540, at *6 (Tex. App.—Fort Worth June 26, 2025, no pet. h.) (mem. op., not designated for publication) (citing *Gigliobianco*, 210 S.W.3d at 641 (providing scientific evidence as an example of the type of evidence that "might mislead a jury that is not properly equipped to judge" its "probative force")).

And finally, as to the sixth factor, Mary's rebuttal testimony amounted to approximately nine pages of testimony out of the four hundred seventy-four pages of the reporter's record comprising the two-day guilt-innocence phase of Pixley's trial.

23

This short testimony, even considered with the approximately twenty-one pages of argument about the admissibility of the extraneous-offense evidence, did not consume an inordinate amount of time during trial. *Id.* (holding that when the extraneous-offense testimony comprised "approximately thirteen of the nearly three hundred pages of the reporter's record," it did not consume an inordinate amount of time).

Because the trial court's admission of Mary's rebuttal testimony under Rule 403 is within the zone of reasonable disagreement and the trial court did not err by finding the probative value of the testimony was substantially outweighed by the risk of unfair prejudice, we cannot conclude the trial court's admission of the extraneous-offense testimony was an abuse of discretion. We overrule Pixley's third issue.

### 4. Harm Analysis

Despite Pixley's claim that the trial court committed reversible error by allowing Mary's rebuttal testimony in violation of his constitutional rights, that is not the appropriate harm standard here. *See Patterson*, 508 S.W.3d at 440. The erroneous admission of evidence is not a constitutional error. *See id.* Additionally, we have determined that the trial court did not err in admitting Mary's extraneous-offense testimony under Rule 403 and thus we need not reach the nonconstitutional error analysis. *See* Tex. R. App. P. 47.1.

However, even if we were to assume the trial court did err in admitting Mary's testimony, we find that Pixley's substantial rights were not affected. *See* Tex. R. App. P. 44.2(b). Pixley effectively used cross-examination to elicit testimony that Mary had

24

previously lied about the abuse and that her therapist had never made a report, despite Mary's stating that she had told the therapist about the offenses. There is nothing to support that the jury gave impermissible weight to Mary's testimony or that it did more than offer slight support to Alice's allegations. *See Bagheri*, 119 S.W.3d at 763 (holding that if, after examining the record as a whole, the appellate court has fair assurance that the error did not influence the jury, or had but a slight effect, the appellate court must disregard the error). Consequently, we overrule Pixley's second issue.

## C. Sufficiency of the Evidence

In his fourth issue, Pixley argues that the evidence was "insufficient to show the commission of the offense of continuous sexual abuse of a child . . . under fourteen years of age because there was no proof beyond a reasonable doubt of when the second act was committed."

### 1. Standard of Review

In an evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for that of the factfinder. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608.

To determine whether the State has met its burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by a hypothetically correct jury charge to the evidence adduced at trial. *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021); *see also Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("The essential elements of an offense are determined by state law."). A hypothetically correct jury charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Hammack*, 622 S.W.3d at 914. The law as

authorized by the indictment means the statutory elements of the offense as modified by the charging instrument's allegations. *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021); *see Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Carter v. State*, 620 S.W.3d 147, 149 (Tex. Crim. App. 2021). As a result, in an evidentiary-sufficiency review "[w]e consider both direct and circumstantial evidence as well as any reasonable inferences that may be drawn from the evidence." *Garrett v. State*, 693 S.W.3d 490, 494 (Tex. App.—Houston [14th Dist.] 2023, pet. ref'd) (citing *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016)).

### 2. Applicable Law

Count one of the indictment charged Pixley with committing continuous sexual abuse of a child. A person commits the offense of continuous sexual abuse of a child if, "during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse" and the person is seventeen years of age or older and the victim is a child younger than fourteen years of age. Tex. Penal Code Ann. § 21.02(b).

"Although the exact dates of the acts of sexual abuse need not be proven, the offense of continuous sexual abuse of a child requires proof that one act of sexual abuse

occurred on at least the 29th day after the day of another act of sexual abuse." *Lawson v. State*, No. 02-17-00201-CR, 2018 WL 1192478, at \*4 (Tex. App.—Fort Worth Mar. 8, 2018, no pet.) (per curiam) (mem. op., not designated for publication). A "child complainant [is] not required to be specific about the dates and times that the sexual abuse occurred." *Norris v. State*, No. 02-23-00298-CR, 2024 WL 3458077, at \*6 (Tex. App.—Fort Worth July 18, 2024, pet ref'd) (mem. op., not designated for publication) (citing *Turner v. State*, Nos. 05-21-00922-CR, 05-21-00924-CR, 2023 WL 3991662, at \*3 (Tex. App.—Dallas June 14, 2023, pet. ref'd) (mem. op., not designated for publication)). Instead, the jury is permitted to "piece together the timeframe of the abuse from testimony concerning a child's . . . milestones, such as school years, the child's age, seasons, and places where the child lived." *GonzalezCastillo v. State*, No. 02-22-00156-CR, 2023 WL 5115535, at \*4 (Tex. App.—Fort Worth Aug. 10, 2023, no pet.) (mem. op., not designated for publication); *see Flowers v. State*, 220 S.W.3d 919, 923 (Tex. Crim. App. 2007) ("The trier of fact fits the pieces of the jigsaw puzzle together and weighs the credibility of each piece.").

### 3. Pixley's Complaint

Pixley challenges the finding that the offense was "continuous"—that it happened "during a period that is 30 days or more in duration." *See* Tex. Penal Code Ann. § 21.02(b)(1). He does not contest the sufficiency of the evidence as to the first and second acts of sexual abuse described by Alice. Pixley focuses on Mother's

28

testimony that she "believes" Alice was at Pixley's house with her over Thanksgiving break 2019.[11]

### 4. Analysis

Alice did not testify to the dates of either incident. Instead, she stated the first abuse happened when she stayed overnight at Pixley's home with her sister in 2019. Mother testified that the first time Alice and her sister ever stayed the night at Pixley's was on August 3, 2019. Mother's testimony corroborates Alice's account and supports that the first time Alice was abused by Pixley was in August 2019.

Alice also testified to another instance of abuse from Pixley while Mother was there. When Alice was asked what happened the time she was there with Mother, she replied, "Everything from the first night, everything I just told you." Mother and Pixley both testified that Mother was living with Pixley during Thanksgiving 2019, with Pixley stating that Mother moved in around October 2019 and stayed for "about three months." Mother also testified that Alice spent all of Thanksgiving break with her in 2019. This corroborates Alice's testimony that a subsequent incident of abuse occurred while staying with Mother at Pixley's home. *See, e.g.*, *Hernandez v. State*, No. 05-17-00560-CR, 2018 WL 2316026, at *4 (Tex. App.—Dallas May 22, 2018, pet. ref'd) (mem. op., not designated for publication) ("While the girls were unable to provide specific dates

---

[11]This takes Mother's testimony out of context. Mother was asked, "When is the next time after you dropped them off [in August 2019] that you went back and picked them up?" Mother replied, "I believe—I believe it was Thanksgiving."

29

for when the abuse occurred, they referred to the sexual abuse occurring at different houses[,] and their mother was able to provide a timeline of when they resided at those houses."); *Lawson*, 2018 WL 1192478, at *4 (relying on testimony associating the abuse with school years, seasons, and holidays to hold the evidence sufficient despite lack of specific dates). And even if Mother was incorrect, and Alice visited before Thanksgiving but while Mother was living with Pixley, the earliest that visit would have occurred was sometime in October 2019—more than thirty days after Alice had claimed the first instance of abuse occurred.

Further, we presume the jury resolved all conflicts in favor of the verdict. *Braughton*, 569 S.W.3d at 608. Based on the testimony from Alice, Mother, and Pixley, the jury need not have speculated, theorized, or guessed to reach the reasonable conclusion that Pixley sexually assaulted Alice on at least two occasions between August 2019 and Thanksgiving 2019, a period of more than thirty days. There was no testimony that Alice visited before Mother was living with Pixley.

Having concluded that the jury rationally could have found—beyond a reasonable doubt—that Pixley sexually abused Alice during a period of more than thirty days, we overrule Pixley's fourth issue. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789.

## IV. REFORMATION OF JUDGMENTS

We note two clerical errors in the judgments. We have the power to modify the trial court's judgment to make the record speak the truth when we have the necessary information to do so. *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993); *Mayo*

30

*v. State*, 690 S.W.3d 103, 109 (Tex. App.—Amarillo 2024, pet. ref'd) (op. on reh'g). We have the power to reform whatever the trial court could have corrected by a judgment nunc pro tunc when the evidence necessary to correct the judgment appears in the record. *Mayo*, 690 S.W.3d at 109; *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.— Dallas 1991, pet. ref'd). This power does not depend on a party's request,[12] nor does it turn on whether a party has objected in the trial court. *Mayo*, 690 S.W.3d at 109; Asberry, 813 S.W.2d at 529–30.

Here, the judgments each reflect a $100 fine. But the jury did not assess any fines, and the trial court did not order any when sentencing Pixley. Thus, that portion of each judgment should reflect no fine. *See e.g.*, *Newsted v. State*, No. 02-24-00246-CR, 2025 WL 1085197 at *2 (Tex. App.—Fort Worth Apr. 10, 2025, no pet.) (mem. op., not designated for publication).

The $100 in each judgment, however, should be added to the court costs. *See* Tex. Code Crim. Proc. Ann. art. 102.0186 (concerning a $100 "fine" for persons convicted under Penal Code Sections 21.02 and 21.11, as relevant in this case). The portion of the judgment reflecting court costs of $290 in each judgment should thus be adjusted to reflect $390 in each judgment. We also note that the trial court ordered the court costs, reimbursement fees, and (previously incorrect) fine to be credited for time

---

[12]We note that in Pixley's appellate brief, he does point out—in a single sentence—that no fines were assessed at punishment by the jury, and requests that the judgments be modified.

served.  *See generally* Tex. Code Crim. Proc. Ann. art. 43.09 (addressing credit for time served).

Accordingly, we (1) delete the $100 fine from each judgment and modify the judgments to reflect no fine and (2) delete the $290 in court costs and modify the judgments to reflect $390 in court costs.  We affirm the trial court's judgments as modified.

## V.  CONCLUSION

Having overruled all of Pixley's issues on appeal, we affirm the trial court's judgments as modified.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  August 21, 2025